UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENILDA REMIGIO et al., <br><br> Plaintiff, <br><br> v. <br><br> EAGLE ROCK RESORT, Co., et al., <br><br> Defendants. | CIVIL ACTION NO. 3:21-CV-01756 <br><br> (MEHALCHICK, J.) |

**MEMORANDUM**

Presently before the Court is a motion to exclude and a motion for summary judgment filed by Defendants Eagle Rock Resort Co., and Double Diamond-Delaware, Inc., ("Defendants)" on April 17, 2023. (Doc. 54; Doc. 57). Plaintiffs Benilda Remigio and Salvador Inigo Remigio ("Plaintiffs") initiated this action by filing a complaint on October 15, 2021. (Doc. 1). On May 20, 2022, Plaintiffs filed an amended complaint with leave of court. (Doc. 31). In their amended complaint, Plaintiffs assert a claim under the Interstate Land Sales Act 15 U.S.C. 1719 ("ILSA"), state law claims of fraud, and a violation of the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL"). (Doc. 31, at 16-25). After a period of discovery, Defendants moved for summary judgment on April 17, 2023. (Doc. 54). For the reasons stated herein, Defendants' motion for summary judgment will be **GRANTED**.[1] (Doc. 54).

I. **SUMMARY OF MATERIAL FACTS**

This factual background is taken from Defendants' statement of material facts and

---

[1] Based upon the Court's disposition of Defendants' motion for summary judgment, Defendants' motion to exclude the testimony of Richard C. Linquanti, Esquire will be dismissed as **MOOT**. (Doc. 57).

accompanying exhibits. (Doc. 56; Doc. 54-1; Doc. 54-2; Doc. 54-3). Pursuant to Local Rule 56.1, Plaintiffs have provided their response to Defendants' statement of facts.[2] (Doc. 61). Where Plaintiffs dispute facts and support those disputes in the record, as required by Local Rule 56.1, those disputes are noted. Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition, the facts have been taken in the light most favorable to Plaintiffs as the non-moving party, with all reasonable inferences drawn in their favor.

    A. PROCEDURAL HISTORY

On October 15, 2021, Plaintiffs initiated this action by filing a complaint alleging a claim under the ILSA, state law claims of fraud, and a violation of the UTPCPL. (Doc. 1). Plaintiffs' original complaint arises from a sale and subsequent purchase of a building at Eagle Rock Resort. (Doc. 1, at 3-5). Defendants filed their answer to Plaintiffs' complaint with affirmative defenses on November 9, 2021. (Doc. 7).

On March 16, 2022, Plaintiffs filed a motion to amend their original complaint, which the Court granted on May 20, 2022. (Doc. 20; Doc. 30). Defendants filed an answer to Plaintiffs amended complaint on June 10, 2022. (Doc. 33).

---

[2] In addition to providing responses to Defendants' statement of facts, Plaintiffs have provided sixteen additional paragraphs styled as "PLAINTIFFS' BENILDA REMIGIO AND SALVADOR INIGO REMIGIO'S STATEMENT OF UNCONTESTED FACTS." (See Doc. 62, ¶¶ 1-16). Neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 authorizes this filing, and plaintiffs did not request leave of court therefor. The Court thus declines to accord these paragraphs the evidentiary weight contemplated by Rule 56.1. *See Barber v. Subway*, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (Conner, J.); *see also Rau v. Allstate Fire & Cas. Ins. Co.*, 793 F. App'x 84, 87 (3d Cir. 2019) (nonprecedential) (citing with approval, *inter alia*, *Barber*, 131 F. Supp. 3d at 322 n.1, in holding that district courts enjoy wide discretion in interpreting their local rules). Nonetheless, the Court has examined the entire Rule 56 record, including Plaintiffs' counterstatements in resolving the motion.

On April 17, 2023, Defendants filed the instant motions, along with briefs in support of their motions and a statement of facts with corresponding exhibits. (Doc. 54; Doc. 54-1; Doc. 54-2; Doc. 54-3; Doc. 55; Doc. 56; Doc. 57; Doc. 58). On April 27, 2023, Plaintiffs filed a reply brief to Defendants' motion to exclude with corresponding exhibits. (Doc. 60; Doc. 61-1). On May 4, 2023, Plaintiffs filed a response to Defendants' statement of material facts pursuant to Local Rule 56.1 as well as a reply brief to Defendants' motion for summary judgment with corresponding exhibits.[3] (Doc. 61; Doc. 62; Doc. 63; Doc. 63-1; Doc. 63-2; Doc. 63-3; Doc. 63-4; Doc. 63-5; Doc. 63-6; Doc. 63-7; Doc. 63-8; Doc. 63-9; Doc. 63-10; Doc. 63-11; Doc. 63-12; Doc. 63-13; Doc. 63-14; Doc. 63-15; Doc. 63-16; Doc. 63-17; Doc. 63-18; Doc. 63-19). Defendants filed a reply brief on May 18, 2023. (Doc. 67). On May 18, 2023, Defendants filed a reply brief in support of their motion for summary judgment. (Doc. 67). The Court conducted oral argument concerning the pending motion to exclude and motion for summary judgment on May 30, 2023. (Doc. 68). The motions have been fully briefed and are ripe for disposition. (Doc. 54; Doc. 55; Doc. 56; Doc. 57; Doc. 58; Doc. 60; Doc. 61; Doc. 62; Doc. 63; Doc. 65; Doc. 67).

B. FACTUAL BACKGROUND

Mrs. Remigio is a physical therapist currently employed with UPMC Carlisle Hospital. (Doc. 56, ¶ 1; Doc. 54-1, at 7). In 2011, Ms. Remigio lived at 1962 Seventh Avenue, Apt. 3A, New York, NY 10026. (Doc. 56, ¶ 2; Doc. 54-1, at 7). On March 30, 2021, Plaintiffs moved to 1 Candlelit Lane, Newville, PA 17241. (Doc. 56, ¶ 3; Doc. 54-1, at 8).

---

[3] On May 5, 2023, the Court re-docketed Plaintiffs' reply brief to Defendants' motion for summary judgment as a brief in opposition. (Doc. 65; Doc. 65-1; Doc. 65-2; Doc. 65-3; Doc. 65-4; Doc. 65-5; Doc. 65-6; Doc. 65-7; Doc. 65-8; Doc. 65-9; Doc. 65-10; Doc. 65-11; Doc. 65-12; Doc. 65-13; Doc. 65-14; Doc. 65-15; Doc. 65-16; Doc. 65-17; Doc. 65-18; Doc. 65-19).

On the date of their tour, Plaintiffs met in the Bronx with previous co-workers, their families, and other couples they did not know, and rode in a van provided to them by Aida Toledo. (Doc. 56, ¶ 5). Part of the group in the van with Ms. Remigio were property owners Aida Toledo, Oswald Orgo, and Mary Jane Infante. (Doc. 56, ¶ 6; Doc. 54-1, at 11-12). Ms. Remigio testified that when they visited Eagle Rock, Aida Toledo told the Remigios where her lot was located, and Mary Jane Infante showed the Remigios her property. (Doc. 56, ¶ 8; Doc. 54-1, at 13). Ms. Remigio testified that she knew another couple, Cecil Cabagay (a nurse), and his wife from the Bronx, who went to Eagle Rock Resort that day, leaving from the same location, but were in a different vehicle (like a convoy). (Doc. 56, ¶ 9; Doc. 56, at 14). Ms. Remigio testified that she recalled going nowhere on Saturday. (Doc. 56, ¶ 10; Doc. 54-1, at 18). On tour day, they went to a building and sat in a room with the other individuals who were staying at the cabin. (Doc. 56, ¶ 10; Doc. 54-1, at 18). This is when the Remigios met salesperson, Glen Walkley. (Doc. 56, ¶ 10; Doc. 54-1, at 18). Those individuals who were visiting but not going on the tour went to the building but did not enter the room where the group sales presentation was occurring. (Doc. 56, ¶ 11; Doc. 54-1, at 19). Mrs. Remigio recalls that the sales presentation was verbal. (Doc. 56, ¶ 12; Doc. 54-1, at 20). After the sales presentation, the Remigios got in a vehicle (Mrs. Remigio was not sure what type of vehicle they were transported in) and they went on a tour, where Ms. Remigio claims that they were not shown the ski resort and claimed that she did not know there was a ski resort at Eagle Rock. (Doc. 56, ¶ 13; Doc. 54-1, at 22). Mrs. Remigio claims that she does not recall seeing a pool or beach during their tour. (Doc. 56, ¶ 14; Doc. 54-1, at 11). Ms. Remigio stated that she had a vivid recollection of being on the tour and laughing and talking while being shown the Western Summit South Phase IV property. (Doc. 56, ¶ 15; Doc. 54-1, at 24). Ms. Remigio

stated that the group was shown Western Summit South Phase IV and was informed by Glen Walkley that there were four or five lots available for purchase, adjoining and that Ms. Remigio specifically wanted Lot 53 because it was a "corner lot." (Doc. 56, ¶ 16; Doc. 54-1, at 24). Ms. Remigio claims that they were not shown the Hidden Forest, and that they were only shown the Western Summit South lots, which were not delineated but rather just one long grassy area with trees, and that there was no rope, paint, or anything delineating the property.[4] (Doc. 56, ¶ 17; Doc. 54-1, at 28). Ms. Remigio stated that they never were taken to view the Hidden Forest III lot, nor were they shown Hidden Forest III lot, nor was the name "Hidden Forest" ever mentioned.[5] (Doc. 56, ¶ 18; Doc. 54-1, at 28). After the tour, Ms. Remigio stated that they went back to the building but did not recall who was with her and stated that at the time she and her husband were talking about purchasing. (Doc. 56, ¶ 19; Doc. 54-1, at 29). Ms. Remigio admitted that she was satisfied with the tour, and the Remigios agreed to purchase. (Doc. 56, ¶ 20; Doc. 54-1, at 29). Ms. Remigio is unclear about many details surrounding the closing but recalls that they reviewed the Real Estate Contract closely. (Doc. 56, ¶ 21; Doc. 54-1, at 30-31). When asked whether she recalled noticing that the Contract said undivided one-fiftieth interest and what that meant, she replied "Yes". (Doc. 56, ¶ 22; Doc. 54-1, at 31). Mrs. Remigio stated that she was aware that by purchasing the property that they would become members of the Eagle Rock Community Association. (Doc. 56, ¶ 23; Doc. 54-1, at 32). Mrs. Remigio also remembers seeing, signing, but not reading the

---

[4] Plaintiffs deny this assertion in part, stating: "It is denied, based upon the testimony of Glenn Walkley at page >> of his deposition transcript that it is uncontested that Remigio was not shown the Hidden Forest subdivision. (Doc. 61, ¶ 17).

[5] Plaintiffs deny this assertion, stating: "It is denied, based upon the testimony of Glenn Walkley at page >> of his deposition transcript that it is uncontested that Remigio was not shown the Hidden Forest subdivision. (Doc. 61, ¶ 18).

lot conversion addendum to the real estate Contract. (Doc. 56, ¶ 24; Doc. 54-1, at 32). Ms. Remigio testified that she had a lot of questions and was very confused but did not consult with an attorney or real estate professional. (Doc. 56, ¶ 25; Doc. 54-1, at 42-43). The Remigios drove home from Eagle Rock with the same people they arrived with, and Mr. and Mrs. Cabagay also purchased a lot that weekend. (Doc. 56, ¶ 26; Doc. 54-1, at 16, 42). The Remigios were provided with a big manilla envelope of documents to take with them and they did not have an attorney, nor a realtor review the real estate documents. (Doc. 56, ¶ 27; Doc. 54-1, at 42). When the Remigios received the conversion documents in 2014, she said it took them six months before they signed the conversion documents and sent them back to Eagle Rock. (Doc. 56, ¶ 28; Doc. 54-1, at 44). Between August 1, 2014, through December 14, 2014, Mrs. Remigio did not take any of the paperwork sent to her by Blahosky to an attorney or real estate agent. (Doc. 56, ¶ 29; Doc. 54-1, at 47). In 2014, the R[e]migios only spoke to Alex Blahoksy and did not speak to Glen Walkley. (Doc. 56, ¶ 30; Doc. 54-1, at 49).

On June 21, 2021, [the] Remigios decided to check on the lot they purchased in the hope that it might be a goo[d] time to build a cabin, but could not find the lot. (Doc. 56, ¶ 31; Doc. 54-1, at 50). The deed signed in 2014, deposition exhibit 49, conveyed Plaintiffs' rights in the 1/50th interest in Lot 53 WSS4 back to Eagle Rock.[6] (Doc. 56, ¶ 32). Plaintiff did not identify any statement made by Alex Blahosky as to why Remigio was signing a new deed when Remigio stated that they thought they were doing a lot number change.[7] (Doc. 56, ¶ 33;

---

[6] Plaintiffs deny this assertion in part, stating: "It is contested and denied that the deed was signed in 2014." (Doc. 61, ¶ 32).

[7] Plaintiffs deny this assertion stating: "Remigio was not asked if Alex Blahosky made any statement as to why Remigio was signing a new deed. Therefore, Remigio's silence is not a fact." (Doc. 61, ¶ 33).

Doc. 54-1, at 53). Plaintiff signed the document acknowledging that they received the New York offering statement but claims they did not receive or review it.[8] (Doc. 56, ¶ 34; Doc. 54-1, at 54). The Remigios did not contact anyone at the homeowners association after getting invoices for the dues. (Doc. 56, ¶ 35; Doc. 54-1, at 55). The Remigios received information regarding homeowners association Board elections and did not respond. (Doc. 56, ¶ 36; Doc. 54-1, at 55). The Remigios did not return to Eagle Rock after their one visit, did not return to use the amenities, and did not try to sell the lot. (Doc. 56, ¶ 37; Doc. 54-1, at 56). [The] The Remigios were sent a certificate for an overnight stay at Eagle Rock and were not interested so did not use it. (Doc. 56, ¶ 38; Doc. 54-1, at 56).

From April 2015 until June 21, 2021, Plaintiffs made no contacts with anyone at Eagle Rock. (Doc. 56, ¶ 39; Doc. 54-1, at 57). Alexandra Blahoksy stated that once Eagle Rock received HUD approval in certain sections, she would contact the property owners in that section, call them to make appointments for them to come up to the resort, prepare paperwork for their actual lots, and then they would sign the paperwork. (Doc. 56, ¶ 40; Doc. 54-2, at 7). People who needed to convert their lots were placed on a specific list. (Doc. 56, ¶ 41; Doc. 54-3, at 9). A form letter was sent out to anyone needing to convert, to let them know that they received HUD approval in their section, and they could now sign up for their actual lot. (Doc. 56, ¶ 42; Doc. 54-2, at 10). If someone did not respond to the letter, Alex would try to continue to reach out to them, either via phone call or via email, and inform them that they have the approval and can sign for their lot. (Doc. 56, ¶ 43; Doc. 54-2, at 12). According to

---

[8] Plaintiffs deny this assertion, stating: "This statement is not uncontested as there is evidence that Eagle Rock never sent Remigio the New York offering statement." (Doc. 61, ¶ 34).

7

the addendum they had 30 days to convert after approval, but Blahosky would try to be a little more patient in case people were away or not reachable. (Doc. 56, ¶ 44; Doc. 54-2, at 12). If there was no response from the buyer, there was a point in time when the mortgage company would begin to contact the buyer and say "we need to get this done for you, or you may not be able to convert." (Doc. 56, ¶ 45; Doc. 54-2, at 13). Someone could hold on to their share of the undivided if they did not want to convert. (Doc. 56, ¶ 46; Doc. 54-2, at 13).

When Blahosky sent the document to the Remigios, she sent them both the scanned blank ones and scanned ones with sticky notes indicating where to sign. (Doc. 56, ¶ 47; Doc. 54-2, at 16). Blahosky confirmed that the property report would have been given to Remigio when they first signed the contract.[9] (Doc. 56, ¶ 48; Doc. 54-2, at 18). One of the attachments to the January 9, 2015, email sent to Remigio by Blahosky was a map. (Doc. 56, ¶ 49; Doc. 54-2, at 41). The map attached to the email showed the old lot and new lot numbers based on the re-plat, and HF 112/HF 327 as shown on the map is not a corner lot. (Doc. 56, ¶ 50; Doc. 54-2, at 41-42). Alex Blahosky stated that HF 112 was renumbered as HF 327 during a replat. (Doc. 56, ¶ 51; Doc. 54-2, at 8). The amenities at Eagle Rock in 2011 consisted of skiing, outdoor pools, an equestrian center, tennis courts, an activity center a restaurant, and the hotel. (Doc. 56, ¶ 52; Doc. 54-2, at 41-42). An undivided interest lot owner did not get a property tax bill. (Doc. 56, ¶ 53; Doc. 54-2, at 42). Following conversion to a permanent lot, a property owner did get a tax bill. (Doc. 56, ¶ 54; Doc. 54-2, at 42).

---

[9] Plaintiffs deny this assertion, stating "It is contested and denied that Remigio was given a copy of a Property Report when they first signed the contract in May 2011." (Doc. 61, ¶ 48)

Glen Walkley was the sales representative for Eagle Rock who sold Remigio their lot. (Doc. 56, ¶ 55; Doc. 54-3, at 8). There was no difference between the sales script Eagle Rock developed for pre-undivided interest sales versus post-undivided interest sales. (Doc. 56, ¶ 56; Doc. 54-3, at 10). The Hidden Forest section was the undeveloped or unapproved section of the development. (Doc. 56, ¶ 57; Doc. 54-3, at 10). Western Summit South was developed and Lot 53 was a show lot with a log home next to it. (Doc. 56, ¶ 58; Doc. 54-3, at 12). Walkley explained to the buyer that they would be purchasing a one-fiftieth interest in the lot. (Doc. 56, ¶ 59; Doc. 54-3, at 15). Walkley also took the prospective buyer to the Hidden Forest lot, got out of the vehicle, and explained that the area is awaiting HUD approval.[10] (Doc. 56, ¶ 60; Doc. 54-3, at 15). The process of the one-fiftieth lot and conversion to a permanent lot was explained to the buyer again at the office by Walkley.[11] (Doc. 56, ¶ 61; Doc. 54-3, at 15). Walkley did not recall Remigios asking him any specific questions. (Doc. 56, ¶ 62; Doc. 54-3, at 18). The Lots for sale in Hidden Forrest were freshly staked out and painted so purchasers could see exactly where the lot was. (Doc. 56, ¶ 63; Doc. 54-3, at 41). Lot 53 WSS4 is not a buildable lot. (Doc. 56, ¶ 64; Doc. 54-3, at 24). Glen Walkley testified that he would exit the vehicle at the Hidden Forrest lot, not the UDI lot. (Doc. 56, ¶ 65; Doc. 54-3, at 15).

II.  **SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled

---

[10] Plaintiffs deny this assertion, stating "Remigio testified that Walkley did not take them to the Hidden Forrest subdivision so this statement is not uncontested." (Doc. 61, ¶ 60)

[11] Plaintiffs deny this assertion, stating: "Remigio testified that Walkley did not take them to the Hidden Forrest subdivision or discuss with them anything about Hidden Forrest so this statement is not uncontested." (Doc. 61, ¶ 61).

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'" *Velentzas v. U.S.*, No. 4: 07-CV-1255, 2010 WL 3896192, at *7 (M.D. Pa. Aug. 31, 2010) (quoting *Goode v. Nash*, 241 F. App'x 868, 869 (3d Cir. 2007)) (citation omitted); *see also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion for summary

judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Velentzas*, 2010 WL 3896192, at *7 (quoting *Goode*, 241 F. App'x at 869). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007).

III. **DISCUSSION**

Moving for summary judgment, Defendants argue that the statute of limitations bars Plaintiffs' claims. (Doc. 55, at 6). In opposition, Plaintiffs argue that the Court should deny summary judgment under the federal discovery rule, the doctrine of equitable tolling, the Pennsylvania discovery rule, and the Pennsylvania doctrine of fraudulent concealment. (Doc. 65, at 12-17).

A. PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

As stated *supra*, Plaintiffs assert claims for violations of ILSA, fraud, and violations of UTPCPL. (Doc. 31). A six-year statute of limitations applies to a UTPCPL claim. *Rodgers v. Lincoln Benefit Life Co.*, 845 F. App'x 145, 147 (3d Cir. 2021) (citing *Morse v. Fisher Asset Mgmt., LLC*, 206 A.3d 521, 526 (2019)) (six-year statute of limitations for UTCPL claims). Plaintiffs' fraud claim is subject to a shorter two-year statute of limitations period. 42 Pa. Cons. Stat. § 5524(7). "[T]he statute of limitations begins to run as soon as the right to institute and maintain a suit arises." *Fine v. Checcio*, 870 A.2d at 857. "It is the duty of the party asserting a

cause of action to use all reasonable diligence to properly inform him-[ ]or herself of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed period." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (2011). Pennsylvania law favors "the strict application of statutes of limitation" *Booher v. Olczak*, 797 A.2d 342, 345 (Pa. Super. Ct. 2002).

ILSA claims are subject to a three-year statute of limitations. *See* 15 U.S.C. § 1711. The accrual date of an ILSA claim, however, depends on the particular type of claim asserted. For an alleged violation of § 1703(a)(2)(A), (a)(2)(B), or (a)(2)(C), the statute of limitations expires "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 1711(a)(2); *Barker v. Hostetter*, No. CIV.A. 13-5081, 2014 WL 1464319, at *12 (E.D. Pa. Apr. 15, 2014).

Here, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs' claims are time-barred. Plaintiffs entered into the Real Estate Sales Contract (the "Contract") for the purchase of an undivided one-fiftieth (1/50th) interest in Lot 53 on May 29, 2011, and Plaintiffs had notice of the conversion of their interest in Lot 53 by August of 2014. (Doc. 30, ¶ 32; Doc. 56, ¶ 28; Doc. 54-1, at 44; Doc. 61, ¶ 28). Plaintiffs initiated this action on October 15, 2021, after the statute of limitations period had expired for each claim. (Doc. 1). As discussed *infra*, Plaintiffs have failed to present evidence that they did anything in the interim period to discover their causes of action against Defendants, nor have they shown that Defendants committed any affirmative act of fraudulent concealment to frustrate discovery despite due diligence. *Giabourani v. Wells Fargo Bank, N.A.*, No. 2:12-CV-00042-MR, 2015 WL 5714538, at *5 (W.D.N.C. Sept. 29, 2015), aff'd, 670 F. App'x 177 (4th Cir. 2016) (concluding plaintiff's ILSA and state law fraud claims were time-barred where

plaintiff waited more than five years to initiate action after signing purchase agreement and plaintiff failed to present evidence that she did anything in the interim to discover her causes of action); *Carter v. Bank of Am., N.A.*, No. 1:11CV326, 2015 WL 3618536, at *5 (W.D.N.C. June 9, 2015) (concluding plaintiff's ILSA and state law fraud claims were time-barred where plaintiff entered into a purchase agreement in 2005 but waited until 2011 to initiate action and failed to present evidence that defendant committed any affirmative act of fraudulent concealment to frustrate discovery and plaintiffs could have discovered violation through exercise of reasonable diligence).

Accordingly, the Court finds that Plaintiffs' claims are time-barred.

B. PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE TOLLING

Plaintiffs argue the limitations period should be tolled under the federal discovery rule, the doctrine of equitable tolling, the Pennsylvania discovery rule, and the Pennsylvania doctrine of fraudulent concealment. (Doc. 65, at 12-17). Although Plaintiffs submit several tolling theories, they do not argue which tolling arguments apply to which cause of action as some tolling theories only apply to federal claims and others apply only to state claims. (Doc. 67, at 2-4). Defendants submit that Pennsylvania's doctrine of fraudulent concealment is the relevant doctrine implicated by Plaintiffs' argument. (Doc. 67, at 3). Unless inconsistent with federal law, state law governs whether the statute of limitations should be tolled. *Castillo v. Maguire*, No. 3:13-CV-02953, 2020 WL 13199169, at *7 (M.D. Pa. Nov. 2, 2020), *report and recommendation adopted*, No. 3:13-CV-2953, 2022 WL 1122836 (M.D. Pa. Apr. 14, 2022). Because the parties do not contend that Pennsylvania's tolling principles are inconsistent with federal law, the Court will apply Pennsylvania's tolling principles. *Castillo*, 2020 WL

13199169, at *7 (applying Pennsylvania tolling principles where the parties did not contend that Pennsylvania's tolling principles are inconsistent with federal law).[12]

1. **Discovery Rule**

"The discovery rule prevents the statute of limitations from commencing until the plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Am. Builders Ins. Co. v. Keystone Insurers Grp.*, No. 4:19-CV-01497, 2023 WL 5004049, at *9 (M.D. Pa. Aug. 4, 2023) (citing *Redenz by Redenz v. Rosenberg*, 520 A.2d 883, 885 (Pa. Super. Ct. 1987)) (quoting *Pastierik v. Duquesne Light Co.*, 491 A.2d 841, 842 (Pa. Super. Ct. 1985)).

Under the discovery rule, "[t]he commencement of the limitations period is grounded on 'inquiry notice' that is tied to 'actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of

---

[12] The Court notes that even if it did apply the federal discovery rule instead of or in addition to Pennsylvania's discovery rule, the outcome would be no different as there is substantial congruency between these doctrines. *See Leonard v. City of Pittsburgh*, No. 2:13-CV-455, 2013 WL 4541727, at *5 (W.D. Pa. Aug. 27, 2013), aff'd, 570 F. App'x 241 (3d Cir. 2014) ("The Court also notes that this conclusion does *not* mean that it discerns any meaningful difference between Pennsylvania's state rule of law and the Third Circuit's federal standard regarding the discovery rule.") Similarly, to the extent that Plaintiffs proceed under the first ground of federal equitable principles, the Court finds that Plaintiffs have not demonstrated that Defendants "actively mislead" the plaintiffs as to warrant equitable tolling. *See Santos ex. Rel. Baeto v. United States*, 559 F.3d 189, 197 (3d Cir. 2009) ("Federal equitable tolling principles are applicable where "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.")

notice of the full extent of the injury, the fact of actual negligence, or precise cause.'"[13] *Gleason*, 15 A.3d at 484 (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009)).

In addition, "[t]he party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence." *Dalrymple v. Brown*, 701 A.2d 164, 224 (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). "The standard of reasonable diligence is objective, not subjective," and "is not a standard of reasonable diligence unique to a particular plaintiff, but instead, a standard of reasonable diligence as applied to a 'reasonable person.' " *Pocono Int'l Raceway,* 468 A.2d at 471 (quoting *Redenz,* 520 A.2d at 886); *accord Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980) (explaining that, in the fraudulent-concealment context, "reasonable diligence ... must be measured by the prudent-man standard which is an objective one")..' " Reasonable diligence is generally a question of fact for a jury but may be resolved as a matter of law where the underlying facts are not in dispute. *See Wilson,* 964 A.2d at 359; *accord Cochran Mill Associates v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007) ("[A]lthough issues concerning a plaintiff's diligence in discovering fraud usually must be resolved by the trier of fact, this is not always the case. A party may fail to exercise due diligence as a matter of law.").

---

[13] S*ee also Fine,* 870 A.2d at 858 ("[T]here are [very] few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 611 (Pa. 2000)) (alterations in original)); *Rice v. Diocese of Altoona-Johnstown,* 255 A.3d 237, 255 (Pa. 2021) ("We acknowledged in *Wilson*, and do so now, again, that the inquiry notice approach is strict and can be perceived as harsh. It is, however, reflective of our discernment of legislative intent. Providing relief from the consequences of the harshness is not in the purview of this [c]ourt.")

Applying the foregoing principles to the undisputed facts, the Court finds that Plaintiffs cannot use the discovery rule to toll the applicable statute of limitations to their claims. Plaintiffs' claimed injuries, the mistaken purchase of Lot 53, WSS4, occurred on May 29, 2011, when they signed the Contract, and they did not commence this action until October 15, 2021. (Doc. 65-5, at 2-4; Doc. 1). Plaintiffs, however, contend that they were unaware of the contractual terms they agreed to and that they could not have discovered, through reasonable diligence, that they had not purchased a fee simple interest in Lot 53, WSS4 on May 29, 2011. (Doc. 65, at 17-20). Plaintiffs claim that Defendants, via Walkely, misled Plaintiffs about the terms of the Contract by failing to show and/or tell Plaintiffs about any of the lots on promotion in Hidden Forest. (Doc. 65, at 10). Regarding the land purchase, Remigio testified that she reviewed the Contract closely, noticed that the Contract stated an "undivided one-fiftieth interest," and remembers seeing and signing, but not reading the lot conversion addendum attached to the Contract, granting Plaintiffs the right to trade their undivided interest in Lot 53, WSS4 for Lot 112, HF3. (Doc. 56, ¶ 21-22, 24; Doc. 54-1, at 30-32; Doc. 61, ¶ 21-22, 24).

Even if the Court were to find that the statute of limitations could be tolled based upon concealment of what lot was being sold in the Contract, Plaintiffs clearly had notice of the conversion in August of 2014, when Blahosky emailed Plaintiffs the conversion documents. (Doc. 56, ¶ 28; Doc. 61, ¶ 28; Doc. 65-11, at 2-3). Remigio testified that while she had a lot of questions and was very confused, she did not consult with an attorney or real estate expert regarding the original Contract or conversion documents. (Doc. 56, ¶¶ 25, 27, 29; Doc. 54-1, at 42-43; Doc. 61, ¶¶ 25, 27, 29). On December 12, 2014, Blahosky sent a follow-up email expressly informing Plaintiffs that Defendants "received HUD approval in section HF2 where

16

your lot is located." (Doc. 65-12, at 2). Further, Blahosky provided Remigio with a map in the January 9, 2015, email showing that Lot 112 was renumbered as Lot 327. (Doc. 56, ¶¶ 49-50; Doc. 54-1, at 41; Doc. 61, ¶¶ 49-50). The map attached to the email did not depict a corner lot. (Doc. 56, ¶ 50; Doc. 54-1, at 41; Doc. 61, ¶ 50). Based on the record, Plaintiffs failed to do anything in the interim period from 2011 to 2021 to discover their causes of action against Defendants. Plaintiffs did not return to visit Eagle Rock after their one visit or contact anyone at Eagle Rock, including the Homeowner's Association of which they were members. (Doc. 56, ¶¶ 23, 35-37; Doc. 61, ¶¶ 23, 35-37; Doc. 54-1, at 32, 55-56).

In sum, Plaintiffs have not provided any evidence to show they exercised due diligence or that they were unable, despite the exercise of diligence, to know of the alleged injury or its cause. *Jacobs v. Beard*, No. CIV.A. 07-514, 2010 WL 3283045, at *4 (W.D. Pa. May 25, 2010), *report and recommendation adopted*, No. CIV.A. 07-514, 2010 WL 3283040 (W.D. Pa. Aug. 17, 2010), *aff'd sub nom. Jacobs v. Sec'y Pa. Dep't of Corr.*, 514 F. App'x 158 (3d Cir. 2013) (declining to toll statute of limitations under the discovery rule and doctrine of fraudulent concealment where plaintiff failed to exercise reasonable diligence and noting that "Pennsylvania courts have held that 'where information is available, the failure of a plaintiff to make the proper inquiries is a failure to exercise reasonable diligence as a matter of law.'") (citing *Kingston Coal Co. v. Felton Min. Co., Inc.*, 689 A.2d 284 (1997)). Accordingly, as a matter of law, the discovery rule does not apply to toll the statute of limitations. *See Fine*, 870 A.2d at 858-59 ("Where … reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.") (citing *Pocono Int'l Raceway*, 468 A.2d at 471)).

### 2. Fraudulent Concealment

Fraudulent concealment is explained by the Pennsylvania Supreme Court as follows:

"Whereas the 'discovery rule' tolls the statute of limitations, the fraudulent concealment doctrine 'is based upon estoppel [and] has its basis in equity.' " *Johnson v. Wetzel*, ––– Pa. ––––, 238 A.3d 1172, 1191 (2020) (Wecht, J., concurring and dissenting). Generally speaking, tolling 'pauses the running of, or "tolls," a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.' *Dubose v. Quinlan*, 643 Pa. 244, 173 A.3d 634, 644 (2017) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 9, 134 S.Ct. 2175, 189 L.Ed.2d 62 (2014) (citation omitted)). When tolling is used as a proxy for 'pause,' the statute of limitations has conceptually started running but the applicable tolling principle serves to delay the point at which the plaintiff is charged with the duty to file suit. Fraudulent concealment, in contrast, is rooted in the recognition that fraud can prevent a plaintiff from even knowing that he or she has been defrauded. Effectively, the distinction is that where fraud has prevented the plaintiff from knowing of his or her cause of action, that cause of action simply does not even exist until the plaintiff becomes aware of, i.e., 'discovers,' the fraud.

*Rice*, 255 A.3d at 247-248.

Thus, the doctrine "allows of the statute of limitations for the period in which the opposing party, through fraud or concealment, causes another party to 'relax [its] vigilance or deviate from [its] right of inquiry into the facts.' " *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 219 (3d Cir. 2022) (quoting *Fine*, 870 A.2d at 860). "[T]he standard applied under the discovery rule requiring that a plaintiff exercise reasonable diligence to discover both an injury and its causes also applies when fraudulent concealment is the asserted basis for tolling the statute of limitations." *Rice*, 255 A.3d at 252.

Pennsylvania's fraudulent-concealment doctrine "is based on a theory of estoppel." *Fine*, 870 A.2d at 860. The "doctrine tolls the statute of limitations where 'through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry.'" *Mest v. Cabot Corp.*, 449 F.3d 502, 516 (3d Cir. 2006) (quoting *Ciccarelli v. Carey*

18

*Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir.1985)). "The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception." *Fine*, 870 A.2d at 860. But "[f]or fraudulent concealment to toll a statute of limitations, 'the defendant must have committed some affirmative independent act of concealment upon which the plaintiffs justifiably relied.'" *Brady v. W.C. Eshenaur & Son, Inc.*, No. 1:20-CV-1280, 2020 WL 5801407, at *3 (M.D. Pa. Sept. 29, 2020) (quoting *Kingston Coal Co. Inc.*, 689 A.2d at 284).

      Plaintiffs' fraudulent concealment defense is based on 1) testimony that Defendant Walkley only showed Plaintiffs lots in WSS4 and that he never told them about the Hidden Forrest subdivision or suggested they were purchasing anything other than a fee simple interest in Lot 53, WSS4; and 2) email exchanges between Plaintiffs and Blahsoky regarding the 2014-15 conversion. (Doc. 65, at 17-20). In reply, Defendants aver that the record fails to establish that Walkley or Blahosky committed any affirmative misrepresentations. (Doc. 67, at 4). As discussed *supra*, even assuming the statute of limitations could be tolled based upon a concealment of which lot was being sold, Plaintiffs were on notice of their claims in August of 2014, when Blahosky emailed Plaintiffs the conversion documents. (Doc. 65-11, at 2-3). Plaintiffs argue that Blahosky's failure to contradict their statement regarding the lot number changes in the March 12, 2015, email constitutes an affirmative act of concealment. (Doc. 65, at 21). However, the March 12, 2014, email makes no reference to Lot 53, WSS4 and there is no evidence that Blahosky was on the tour or present during the signing of the Contract. (Doc. 65-13, at 2). Furthermore, Blahosky in no way prevented Plaintiffs from determining which lot they owned, nor engaged in acts that actively sought to keep the Remigios from discovering the conversion of their lot interest. *See Bariski v. Reassure Am. Life Ins. Co.*, 834 F.

19

Supp. 2d 233, 239 (M.D. Pa. 2011) (concluding the doctrine of fraudulent concealment did not apply where defendant's alleged misrepresentations did not preclude plaintiff from learning critical facts related to his injury); Jacobs, 2010 WL 3283045, at *4 (plaintiff's claim is not entitled to the benefit of fraudulent concealment where defendant did not identify any information keeping plaintiff from determining whether he was being given appropriate medical care). Blahosky's December 14, 2014, belies Plaintiffs' contention that she engaged in any act of concealment that would divert or mislead Plaintiffs from discovering their injury, as the email expressly states that their lot was located in section HF2. (Doc. 65-12, at 2); Fine, 870 A.2d at 860–61; see also Mest, 449 F.3d at 517 (requiring plaintiff to demonstrate an act of concealment on the part of the defendant that "would divert or mislead the plaintiff from discovering the injury"). The fraudulent concealment doctrine does not toll the statute of limitations where the plaintiff knew or should have known of his claim despite the defendant's misrepresentation or omission. Mest, 449 F.3d at 516 (citing Bohus v. Beloff, 950 F.2d 919, 925-26 (3d Cir. 1991). The Court finds the doctrine of fraudulent concealment does not toll Plaintiffs' claims. Accordingly, Defendants' motion for summary judgment is **GRANTED**. (Doc. 54).

IV. **CONCLUSION**

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED** and Defendants' motion to exclude dismissed as **MOOT.** An appropriate Order follows.

BY THE COURT:

Dated: April 30, 2024

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**